**FILED**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

JAN 1 5 2008

U. S. DISTRICT COURT
E. DISTRICT OF MO.

| | | |
|---|---|---|
| UNITED STATES *ex rel.* AMANDA RICHARDS and ANNETTA SCHWADER; and AMANDA RICHARDS and ANNETTA SCHWADER, INDIVIDUALLY,<br><br>Plaintiffs,<br><br>v.<br><br>ABDUL NAUSHAD, M.D., P.C., d/b/a ADVANCED PAIN CENTERS SAINT LOUIS, LLC, ADBUL NAUSHAD, M.D., ULTIMATE PRACTICE SOLUTIONS, LLC and AZEEM MEO,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **CIVIL ACTION NO.**<br>**4 : 08CV00066  CDP**<br>**IN *CAMERA***<br>**AND UNDER SEAL**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

*Qui tam* Plaintiff-Relators Amanda Richards and Annetta Schwader ("Plaintiff-Relators"), by and through their undersigned attorneys, on behalf of the United States of America and themselves individually, allege as follows in support of their Complaint against Defendants Abdul Naushad, M.D., P.C., d/b/a Advanced Pain Centers St. Louis, LLC, Abdul Naushad, M.D., Ultimate Practice Solutions, LLC and Azeem Meo based upon personal knowledge and relevant documents:

**I.    NATURE OF ACTION**

1.    This is a *qui tam* action on behalf of the United States of America (the "Government") against Defendants Abdul Naushad, M.D., P.C., d/b/a Advanced Pain Centers St. Louis, LLC, Abdul Naushad, M.D., Ultimate Practice Solutions, LLC and Azeem Meo (collectively "Defendants") arising from Defendants' knowing violation of

Federal Civil False Claims Act, 31 U.S.C. §3729 *et seq.*, as amended ("the FCA" or "the Act"). Specifically, since at least the beginning of 2005, Defendants' have systematically and knowingly submitted false claims to Medicare, Medicare Part D and Missouri Medicaid, have knowingly created and used false records to get false claims paid, and have willfully and have knowingly conspired to submit false claims.

## II.  JURISDICTION AND VENUE

2.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 31 U.S.C. §3732. Moreover, the statutory bar set forth in 31 U.S.C §3730(e) does not apply to the facts and circumstances of this action.

3.  This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. §3732(a), because it authorizes nationwide service of process and because the Defendants have minimum contacts with the United States. Moreover, the Defendants can be found in, and transact or have transacted business in the Eastern District of Missouri.

4.  Venue is proper in the Eastern District of Missouri pursuant to 31 U.S.C. § 3732(a) because Defendants' maintain their corporate headquarters here, can be found in and transact or have transacted business in this district. In addition, statutory violations, as alleged herein, occurred in this district.

5.  To the extent that there has been a public disclosure unknown to Plaintiff-Relators, Plaintiff-Relators are original sources as defined by 31 U.S.C. §3730(e)(4). They have direct and independent knowledge of the information upon which the allegations set forth herein are based and have voluntarily provided the information upon which this Complaint is based to the Government before filing the instant *qui tam* action.

2

### III. PARTIES

6. The Government Plaintiff in this action is the United States of America. Pursuant to the provisions of 31 U.S.C. §3730(b)(1), Plaintiff-Relators are suing in the name of and on behalf of the United States of America.

7. Annetta Schwader ("Plaintiff-Relator Schwader") resides in Bourbon, Missouri. Plaintiff-Relator Schwader is a nurse practitioner licensed in the State of Missouri. Plaintiff-Relator Schwader was employed as a Nurse Practitioner from August 2005 through November 2007 and worked primarily in APC's Poplar Bluff, Missouri clinic. Plaintiff-Relator also worked from time to time at APC's Cape Giraudeau and Farmington clinics.

8. Amanda Richards ("Plaintiff-Relator Richards") resides in Poplar Bluff, Missouri. Plaintiff-Relator Richards was employed in various capacities by APC from December 2005 through November 2007. From December 11, 2005 until April 2006, Plaintiff-Relator Richards was employed by APC as a Licensed Practical Nurse/Nerve Conduction technician. In March 2006, Defendant Meo offered Plaintiff-Relator Richards a promotion to Office Manager, which she accepted, and held from April 2006 through April 2007. As the APC Office Manager, Plaintiff-Relator reported to the APC Medical Director and supervised APC's receptionists, scan technicians, DRX technician, Medical Assistant, Flouroscopy technicians. She was responsible for hiring/firing employees, submitting time cards to payroll, keeping track of employee vacation/sick days, making sure APC office staff such as receptionists and medical assistants performed their job duties, and customer relations, *i.e.*, handling customer concerns or

3

complaints. In this capacity, she was required to handle an aberrantly large percentage of patients complaints about APC billings, oftentimes which could not be resolved and had to be referred to UPS, pursuant to Defendant Meo's instructions. In April 2007, Defendants Naushad and Meo promoted Plaintiff-Relator Richards again, this time to the position of Administrator, thereby expanding the scope of her job duties to encompass monitoring the day-to-day operations of APC.

9. Plaintiff-Relators bring this action on behalf the United States Government to remedy the damages that Medicare, Medicare Part D, Medicaid, the VA, CHAMPUS/Tricare, and other government payors have suffered as a result of false reimbursement claims knowingly submitted by, and knowingly caused to be submitted by, Defendants.

10. Defendant Abdul Naushad, M.D., P.C., is a Missouri professional corporation, in the business of providing pain management healthcare services. Defendant Abdul Naushad, M.D., P.C. identifies its registered agent as Abdul N. Naushad located at 2865 James Boulevard, P.O. Box 368, Poplar Bluff, MO 63902.

11. Defendant Abdul Naushad, M.D., P.C., is currently doing business as Defendant Advanced Pain Center St. Louis, LLC ("APC"). APC is a Missouri limited liability company with a registered address of 13025 Mason Estates Court, St. Louis, MO, 63141 (which also happens to be the home address of Defendant Naushad). APC has identified its resident agent to be Wajiha A. Naushad. Wajiha Naushad is the wife of Defendant Abdul Naushad, M.D. APC is in the business of providing pain management to its patients many of whom are elderly participants in the Medicare program and low-income and other persons who are eligible to participate in the Medicaid program. The

4

processes used by Defendant Naushad d.b.a APC to provide pain management includes spinal decompression therapy performed on an "experimental" device known as the DRX-9000, horizontal therapy, electrical simulation, myofacial release, neuromuscular re-education, Botox injections, and pain procedures/blocks.

12.     APC's offices at which it employs physicians, nurse practitioners, technicians and medical assistants to provide pain management to Medicare and/or Medicaid patients are located at:

- 2865 James Boulevard, Poplar Bluff, MO 63901;

- 1207 Maple Street, Farmington, MO, 63640;

- 35 Doctor's Park, Cape Girardeau, MO 63701; and,

- 190 Industrial Drive, Crystal City, MO 63028.

13.     Each of these offices has its own tax identification number and Medicare and Medicaid provider number.

14.     Defendant Abdul Naushad, M.D. is the owner of Abdul Naushad, M.D., P.C. and APC. Defendant. Naushad is a physician licensed by the State of Missouri specializing in pain management.

15.     Defendant Ultimate Practice Solutions ("UPS") is a Missouri limited liability company with a registered address of P.O. Box 1600, 2165 N. Westwood Blvd., Poplar Bluff, MO, 63902. UPS's resident agent is Wajiha A. Naushad – the wife of Abdul Naushad, M.D. At all relevant times, UPS performed the billing and insurance reimbursement, including reimbursement from the Medicaid and Medicare Programs for Defendant Abdul Naushad, M.D., P.C. d/b/a APC.

5

16.     Defendant Azeem Meo is the owner and member of UPS. The relationship between APC and UPS is highly incestuous. Defendant Meo is the former CEO of APC, the pet company for which UPS provides Medicare (including Medicare Part D) and Medicaid billing services, and the father-in-law of Defendant Naushad. UPS, by and through Meo, materially assisted and conspired with Defendants Naushad and his alter ego APC.

## IV.    FILING UNDER SEAL

17.     In accordance with 31 U.S.C. § 3730(b)(2), this Complaint is filed *in camera* and will remain under seal and will not be served on the defendants until the Court so orders. A copy of the Complaint and a written disclosure of substantially all material evidence and information in the possession of Plaintiff-Relators will be served on the United States pursuant to 31 U.S.C. § 3730(b)(2) and FED.R.CIV.P. 4(i). The written disclosure is incorporated herein by reference.

## V.    GOVERNMENT FUNDED HEALTHCARE PROGRAMS

18.     "Federal health care program" is defined in the Medicare fraud and abuse statute as:

> (1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government . . . ; or,
>
> (2) any State health care program , as defined in section 1320a - 7(h) . . .

42 U.S.C. § 1320a-7b (f).

19.     Federal health care programs include, but are not limited to, Medicare, Medicaid, CHAMPUS and CHAMPVA. Although there are numerous federally funded

6

health insurance programs, the Medicare and Medicaid programs account for the majority of government spending in this area.

20.    Congress established the Medicare program in 1965 with the adoption of Title XVIII of the Social Security Act. Medicare is a national health insurance program for people 65 years of age and older, certain younger disabled people, and people with kidney failure.

21.    The Medicaid program was created at the same time as Medicare, when Title XIX was added to the Social Security Act. Medicaid is a public assistance program that provides payment of medical expenses for low-income patients so they can obtain necessary medical services from medical providers throughout the United States. Funding for Medicaid is shared by the United States and those state governments that choose to participate in the program. Among the health benefits funded by Medicaid is funding for the prescription drug needs of Medicaid program beneficiaries. Prior to the enactment of Medicare Part D, the Medicaid program subsidized the purchase of more prescription drugs than any other program in the United States.

22.    Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines. Federal statutes and regulations restrict the drugs and drug uses that the federal government will pay for through its funding of state Medicaid programs. Federal reimbursement for prescription drugs under the Medicaid program is limited to "covered outpatient drugs." 42 U.S.C. §1396b(i)(10), 1396r-8(k)(2), (3).

23.    Critical to the continued viability and solvency of the Medicare and Medicaid programs are the fundamental concepts that medical providers bill the payors

7

only for medical treatments and services that are legitimately medically necessary and actually performed, and further, that medical providers not take advantage of their elderly, disabled or low-income patients.

24. The Department of Health and Human Services ("HHS") is an agency of the United States and is responsible for the funding, administration and supervision of the, *inter alia*, Medicare and Medicaid programs. The Center for Medicare and Medicaid Services ("CMS"), which until July 1, 2001 was called the Healthcare Financing Administration ("HFCA"), is a division of HHS directly responsible for the administration of the Medicare program. In discharging these responsibilities, CMS contracts with private insurance companies, known as carriers or fiscal intermediaries, to receive, review and pay appropriate claims for reimbursement, including claims for reimbursement of physical therapy services provided to program beneficiaries. 42 U.S.C. §1395u. Different carriers and financial intermediacies are responsible for administering claims in different parts of the country.

25. Regional intermediaries acting for Medicare set the compensation rates for services by assigning a specific amount of money to each five-digit Medicare code (the CPT code). The CPT code is essentially shorthand that identifies with particularity the nature of the service performed and being billed for.

26. At all times relevant to the Complaint, Arkansas Blue Cross Blue Shield was the fiscal intermediary who processed Defendant APC's (false) claims submissions.

27. Medicare is divided into three parts. Medicare Part A means the hospital insurance program authorized under Part A of Title XVIII of the Social Security Act. Part A helps pay for care in a hospital and a skilled nursing facility, and for home health

8

and hospice care. Medicare Part B means the supplementary medical insurance program authorized under Part B of Title XVIII of the Social Security Act. Part B helps pay for doctor bills, for outpatient hospital care, and various other medical services not covered by Part A.

28. On December 8, 2003, Congress enacted the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the "MMA"). Title I of the MMA created new outpatient prescription drug coverage under Medicare ("Medicare Part D").

29. Medicare Part D went into effect on January 1, 2006. The Program is administered by the United States Department of Health and Human Services, Centers for Medicare and Medicaid ("CMS"). For "dual eligibles," defined as individuals who received prescription drug coverage under Medicaid in addition to Medicare coverage for other health care in 2005, enrollment in Medicare Part D was compulsory. Such beneficiaries were automatically switched to Part D plans for 2006 and commenced receiving comprehensive prescription drug coverage under Medicare Part D.

30. Pursuant to the Medicare Part D Program, states and the federal government jointly provide funding for the purchases of beneficiaries of that program's prescription drugs through what is commonly referred to as "claw back" provisions.

31. Hereinafter, Medicare and Medicare Part D shall collectively be referred to as "Medicare"

32. Reimbursements to Medicare providers are paid out of the Medicare Trust Fund, which is funded through payroll deductions and additional appropriations by the United States. The Medicare Trust Fund is supposed to reimburse health care providers, such as defendants here, only for those services *actually performed*, that are *medically*

9

*necessary* for the health of the patient and that a physician specifically orders using appropriate medical judgment and acting in the best interest of the patient.

33. Payments from the Medicare Trust Fund are made in reliance upon the representations of the enrolled Medicare suppliers of services to the Program's beneficiaries which seek reimbursement from Medicare that the services billed by the providers are medically necessary for the patient and are actually performed as billed and compensable by Medicare. These representations are explicit and implicit in the reimbursement claims providers submit to the Program. Medicare requires that the service was physically performed and billed according to Medicare policies and procedures code.

34. Generally, any provider of services is qualified to participate and is eligible for payments under Medicare if the provider files with the Secretary of Health and Human Services an agreement to accept assignment on all Medicare claims for covered items and services. Accepting assignment means that the provider agrees to accept the "allowable charge" as determined by Medicare as full payment. 42 U.S.C. § 1395(cc) (Agreements with Providers of Services).

35. The term "provider" means a hospital, a Rural Primary Care Hospital ("RPCH"), a skilled nursing facility, a comprehensive outpatient rehabilitation facility ("CORF"), a home health agency or a hospice that has in effect an agreement to participate in Medicare; or a clinic, a rehabilitation agency, or a public health agency that has in effect a similar agreement but only to furnish outpatient physical therapy, or speech pathology service; or a community mental health center that has in effect a similar

10

agreement but only to furnish partial hospitalization services. 42 CFR § 400.202 (Definitions specific to Medicare).

36. At all times relevant to the Complaint, Defendant APC was an enrolled providers of services under Medicare, Medicaid and other government payor programs.

37. Enrolled Medicare providers are also responsible for the CPT codes set forth in claims submissions to Medicare. By virtue of the participation in the Medicare program, Defendant APC was charged with the knowledge of CPT codes and Medicare coverage rulings. Indeed, in the claims forms requesting payment submitted by Defendant APC, by and through its co-conspirator UPS, contain a variety of certifications that must be executed if the request is to be processed and paid. Fraudulent execution of appropriate certifications, be it implied or express, can lay the foundation for liability under the False Claims Act, 31 U.S.C. § 3729(a)(2).

## VI. DEFENDANTS' KNOWING SUBMISSION OF FALSE CLAIMS

38. Beginning as early as 2005, up to and including the date of the filing of this Complaint, Defendants have willfully or with at least reckless disregard or reckless indifference to the truth engaged in several companywide billing schemes designed to defraud the Medicaid and Medicare Programs (collectively, the "Programs") they were by the submission of knowingly false claims to the Programs for payment in violation of the Federal False Claims Act, 31 U.S.C. §§3729 *et seq*, set forth *infra* at Section VII.

39. At all times relevant to this Complaint, Defendants sought reimbursement from the Programs and knew of the policies, procedures and criteria for obtaining lawful reimbursements under these Programs' regulations. Defendants knowingly violated such

11

policies, procedures and criteria to obtain greater reimbursement payments than they knew they were entitled to receive.

40.     Defendants' false claims submissions, and the creation and use of false statements to get false claims paid, involved *inter alia* the submission of claims containing falsified numerical codes, commonly known as CPT codes. The CPT codes recorded in Medicare and Medicaid claims submissions are statutorily required to represent accurately the specific services rendered to Medicare and Medicaid beneficiaries by APC employees. Defendants knew, or recklessly disregarded, that the Programs rely upon the CPT coding in claims submissions in paying and allowing APC's claims. Nevertheless, Defendants submitted codes or combinations of codes that willfully and/or with reckless disregard failed to represent the services actually performed, with the intent to defraud Medicaid or Medicare. Specifically Defendants' unlawful coding of claims submissions to the Programs caused them to obtain reimbursements which they knew they were not entitled to receive, and would not have received, had the claims forms contained the appropriate codes for payment. Defendants' false Medicare and Medicaid billing schemes took several other forms. Defendants' false billing schemes also included:

- Billing and receiving payment from Medicare and Medicaid for DRX spinal decompression despite knowing or recklessly disregarding that DRX 9000 therapy is deemed experimental and therefore is not covered by Medicare and Medicaid;

- Upcoding services in Medicare and Medicaid claims submissions such that he claims sought reimbursement for more expensive procedures were performed than were actually performed;

- Billing for diagnostic exams that were never performed;

- Billing Nurse Practitioners "incident to" a physician, when in fact, there was no physician present in the clinics;

- Improperly billing physician services under Defendant Naushad's provider identification number that were known not to have been performed by him. This practice was so rampant that Plaintiff-Relators are in possession of APC financial information that documents that of APC's approximately $7 million of revenues in 2006, about $5 million was generated under Defendant Naushad's provider number.

- Billing for and performing medically unnecessary procedures; purchasing and importing Synvisc and Botox at a substantial discount from foreign countries and billing Medicaid and Medicare based upon the Programs' fee schedules;

- Billing fluoroscopy codes for each level of a single anatomical region; billing physicians as *locum tenum* when the physicians failed to meet the criteria;

- For all procedures that require the use of Isovue dye (approximately 5 total) systematically billing Medicare and Medicaid for higher dosages of Isovue than was actually used during those procedures to add to APC's profit margins; prescribing FDA-regulated narcotics and directing office staff to hand off those prescriptions to patients without the physician having examined the patients; and,

- Resuming the treatment of patients that had previously been "fired" due to inconsistent drug screens.

41.     Each of these false billing schemes, examples thereof, and individuals involved are addressed with particularity below.

42.     Defendants' unlawful billing practices and protocols were so abusive that at least one government-funded health program provider – the Veteran's Administration (the "VA") Hospital located in Poplar Bluff, MO – eventually stopped doing business with the APC Poplar Bluff Clinic all together.   Plaintiff-Relators have personal knowledge of the events surrounding the VA's termination of business relations with the APC Poplar Bluff Clinic

13

43. The VA administers health care benefit programs for military veterans and their dependants (the "VA beneficiary" or "VA beneficiaries"). All VA beneficiaries receive hospitalization services at VA hospitals. One such VA hospital was located on Poplar Bluff, which routinely did business and referred patients to APC's Poplar Bluff Clinic; that is, until approximately June 2007.

44. As of August 2005, the general procedure for APC's receipt of VA beneficiary referrals from the Poplar Bluff VA hospital was as follows: APC would receive a referral letter from the Poplar Bluff VA hospital Patient Care Coordinator ("PCC") Norma Freeman and an evaluation appointment was scheduled with an APC physician. As the PCC, Ms Freeman was responsible for the scheduling of all VA physicians' requests for VA beneficiary referrals for evaluation and treatment. Following the evaluation, APC sent Ms. Freeman a letter summarizing the procedure(s) recommended for each VA beneficiary, which would either be confirmed as approved or denied by Ms. Freeman, and the procedure(s) scheduled accordingly.

45. However, on or about August 2006, Plaintiff-Relators noticed that the VA hospital initial referrals were limited in scope and duration, even though the VA beneficiaries had not been evaluated. For example, the referral letter would provide not for an evaluation but instead "Approved for 1 Office Visit and 1 Lumbar Epidural injection only." This clear limitation on the pre-authorized services notwithstanding, Defendant Naushad performed and billed for those services he deemed "necessary," *i.e.* profitable. Then on or about June 2007, the VA hospital stopped referring any VA beneficiaries to APC whatsoever. Plaintiff-Relator Richards called Ms. Freeman for an explanation, at the direction of Defendant Naushad. Ms. Freeman explained that the

14

Poplar Bluff VA Hospital would no longer be referring any VA beneficiaries to APC because they had systematically been receiving unauthorized, unnecessary and excessive treatments.

## A.   False Claims and False Records and Statements for Non-Covered DRX 9000 Vertebral Axial Decompression Therapy.

46.   Defendant Abdul Naushad, M.D., P.C., d/b/a APC, provides spinal decompression therapy to patients using a machine known as the DRX-9000. Defendant APC purchased and began using the DRX-9000 in August 2005.

47.   Medicare's 1997 National Coverage Determinations Manual concluded that the type of therapy provided by the DRX machine – Vertebral Axial Decompression – is an experimental treatment and is not a covered service.

48.   The 1997 Medicare National Coverage Determinations Manual (Pub. 100-03), NCD for Vertebral Axial Decompression (VAX-D), §160.16, (formerly Coverage Issues Manual (CIM) 35-97) states:

### Item/Service Description

Vertebral axial decompression is performed for symptomatic relief of pain associated with lumbar disk problems. The treatment combines pelvic and/or cervical traction connected to a special table that permits the traction application.

### Indications and Limitations of Coverage

There is insufficient scientific data to support the benefits of this technique. Therefore, VAX-D is not covered by Medicare.

49.   Numerous Medicare fiscal intermediaries have interpreted the 1997 coverage in making absolute coverage decisions that the DRX 9000 and other "substantially similar" machines that provide vertebral axial decompression is not a covered service. These carriers include Pinnacle Business Solutions (Missouri), National

15

Heritage Insurance Company ("NHIC") (North and South California); Palmetto GBA

(South Carolina), Regence BlueCross/BlueShield Medicare Part B (Utah)

50.     For example, according to NHIC:

> NHIC does not cover the VAX-D trademarked device per the NCD on "vertebral axial decompression". NHIC interprets the language of the NCD to also cover "vertebral axial decompression" in general. However, even if the language of the NCD were interpreted to be specific to the VAX-D ® device, NHIC does not cover subsequent devices whose FDA approval is based on equivalence to the predicate devices. Devices in this group include VAX-D, MedX, DRS, DRX9000, IDD, and similar devices.
>
> *       *       *
>
> The above services [i.e., the DRX 9000, DRS, IDD], VAX-D and MedX will be denied by Medicare. To bill Medicare Part B for an insurance denial or beneficiary request for a Medicare determination, please use CPT code 97799 (Unlisted physical medicine/rehabilitation services or procedures), with modifier GY and enter "VAX-D" in box 19 of the CMS 1500 claim form or the equivalent electronic field position.

51.     Pinnacle Business Solutions, Inc. published its coverage decision titled

Axial Decompression Therapy, reference number *MO - LSB 081406* online on August 14,

2006. This decision was also published at or around the same time in a Provider

Newsletter. According to that coverage decision, therapy provided by the DRX-9000

services is not covered by Medicare' moreover, the coverage decision explicitly provides

that CPT code 97530 (among other codes) "should **not** be used to bill for services when

providing axial decompression therapy." Pinnacle Business Solutions is a CMS

contracted intermediary and carrier.

52.     Despite knowing that the therapy provided by the DRX machine was not

eligible for reimbursement, or acting in willful disregard or reckless indifference as to the

falsity thereof, Defendants routinely submitted reimbursement claims for DRX 9000

16

therapy to Medicare and Medicaid containing CPT codes 97530, 97014, 97016 and 97112 with the intent to induce unlawful payments from the Programs.

53. CPT code 97530 is defined as "Therapeutic activities, direct (one-on-one) patient contact by the provider (use of dynamic activities to improve functional performance), each 15 minutes."

54. In truth, CPT code 97530 requires "one-on-one" guided exercise therapy requiring the *constant* attendance of a physical therapist or a doctor. DRX 9000 therapy does not involve "one-on-one" therapy. To the contrary, the machine, not a therapist, does the work. DRX 9000 therapy involves harnessing the patient by the upper and lower torso to an attached table, which is raised to a comfortable level. The devise then proceeds to stretch and decompress specific areas that are causing the most back problems. The machine, not a therapist performs the spinal decompression therapy. Defendants falsified CPT codes by billing Medicaid and/or Medicare for 97530, when the treatment was not one-on-one in nature.

55. To facilitate reimbursements from Medicaid and/or Medicare, Defendants attached the GP and KX modifiers to the code for billing for all spinal decompressions performed by the DRX 9000.

56. The GP modifier signified that a physical therapy service was provided by a licensed physical therapist enrolled as a Medicare and Medicaid provider. The KX modifier signified that the service was reasonable, necessary and justified. Defendants submitted reimbursement claims with a GP and KX modifiers, notwithstanding that Defendant Naushad was not a physical therapist nor did he ever employ one at APC.

17

57.     Medicare relies upon the CPT codes and applicable modifiers in allowing or paying claims.

58.     At all times relevant to the Complaint, Defendants have had an affirmative obligation to know the definition of the CPT codes identified in their reimbursement claims to Medicare and Medicaid and what exact services those CPT codes are meant to cover. In fact, Defendants were required in their claims submissions to certify the CPT codes set forth therein to be true and correct.

59.     As a result of Defendants' abuse of improper CPT codes, Defendants obtained reimbursements from Medicare and/or Medicaid that were not eligible for reimbursement. Because the CPT code information on the claims form seeking reimbursement for DRX 9000 services was "knowingly" false or inaccurate (as that term is defined by FCA §§3729(b), they constitute a predicate for an action under the FCA.

**B.     False and Fraudulent Upcoding of Office Visits.**

60.     Enrolled Medicare and Medicaid health care providers are entitled to reimbursement from the Programs for services rendered during office visits to beneficiaries. The amount of the reimbursement depends on the extent and intensity of the level of care provided. Medicare and Medicaid regulations mandate that providers are to rate the level of care on a scale of one to five, with five being the highest.

61.     Defendants routinely submitted claims seeking reimbursement for extensive level of care for patients, when, in fact, the actual level of care provided was less extensive.

18

62.     Defendant APC and its providers use a computer program called AllMeds to record and chart patient encounters. Defendant UPS used a separate program called AdvancedMD to process Defendant APC's billings (and for patient scheduling).

63.     The AllMeds and AdvancedMD software programs were synchronized for billing purposes.

64.     In AllMeds, an APC physician or nurse practitioner input an ICD code and a CPT code into the electronic chart. When UPS accessed the AllMeds program, a pop up screen automatically and immediately appeared identifying all of the outstanding patient encounters to be billed. After either entering the billing charges into Advanced MD or printing out the billing screen, AllMeds permitted UPS to go back and view and/or edits the ICD Codes and CPT codes recorded in the patient's electronic chart for the visit being billed.

65.     When Plaintiff-Relators discovered in July 2007 that UPS had been improperly editing patients' electronic charts by upcoding CPT/ICD codes in the AllMeds software, a block was placed programmed into the system such that patient electronic charts could be viewed only (as necessary to process the claims) but could not be edited.

66.     Prior to AllMeds, patient billing information was recorded by APC physicians on superbills. Defendants Plaintiff-Relators also discovered within the scope of their APC employment that Defendant Azeem Meo – by and through Defendant UPS – endeavored to unlawfully maximize Medicare and Medicaid receivables by upcoding the intensity of patient visits on paper superbills for every patient seen at the APC Cape Giradeau office and/or would falsify records of missed patient visits to reflect that patient

services had been rendered so the visit could unlawfully be billed to Medicare and/or Medicaid.

67.     Upon information and belief, Defendant Meo adhered to this same unlawful billing protocol at the other APC clinics.

68.     This practice stopped a few months after Plaintiff-Relators employment, as Defendants stopped using paper superbills.

69.     Plaintiff-Relators also have personal knowledge that Defendant Meo directed his employees when processing APC claims to change missed visit reports to actual patient visits and to prepare the APC Medicare/Medicaid claims submission under the same level of intensity and CPT or ICD code billed under for the patient's previous visit.

70.     A "missed visit report" is a report generated by AdvancedMD that lists all the patients seen during the previous month for whom no billing invoice was generated. The reasons a patient visit was not billed varied from physician error (i.e., the physician failed to generate a patient encounter chart for a visit) to the patient had simply missed an appointment. Missed visit reports were supposed to be run on a monthly basis and each unbilled visit checked for accuracy. However, the reports typically became backlogged and due to Medicare time restraints on claims billings as there were maybe a few hundred names each time he actually ran a report, instead of researching each visit to determine why the appointment was not billed, Defendant Meo instructed the billing staff to just "bill whatever the codes were for the previous month's visit." In so doing, UPS submitted false Medicare and Medicaid claims on behalf of APC for the reasons that the

20

patients being billed for either were not seen or the codes set forth in the bills did not accurately reflect the services rendered.

71.     Plaintiff-Relators recall on one occasion receiving a missed visit report covering a 6 month period; however, Plaintiff-Relators discovered that UPS had already began making corrections of their own pursuant to UPS's unlawful missed visit billing protocol. Plaintiff-Relators were told by Ricki McCurter, an APC billing office staff member, that UPS had begun "correcting" the missed visits by simply billing the patient visit using whatever code had been last billed for the patient.

72.     As a result, false claims were routinely submitted to, *inter alia*, for services that had not been performed or for different services than were actually performed. These claims were submitted knowing them to be false, or at a minimum in reckless disregard for their falsity, as the nature of the protocol was simply to generate a bill that would be paid or allowed without any attempt to identify what, if any, services had actually been rendered.

73.     Plaintiff-Relators objected to this practice as soon as they discovered it and were assured by UPS Billing Manager Sherry Tomlinson that it would be stopped.

74.     Plaintiff-Relators recall that Defendant Meo, Sherry Tomlinson and the rest of the UPS staff added the falsified codes into the Advanced MD program (and sometimes into the All Meds patient record).

75.     If the physician treating the patient inadvertently forgot to write the reimbursement code in a patient's chart, the billing agency – UPS – would bill the same code as the previous visit without consulting with the treating physician. Further, Defendant Azeem Meo "doctored" and falsified APC's AllMeds system to substantiate

21

the code and corresponding reimbursement request submitted through AdvancedMD. Before Defendant APC switched to AllMeds, Defendant Meo reviewed the original printed/circled patient superbills and each time he identified a code that was "too low" (although accurate), he would erase the code and unlawfully upcoded the level. Plaintiff-Relators have personal knowledge that Defendant Meo engaged in this unlawful billing protocol for the Cape Giradeau clinic Medicare/Medicaid billings and believe he did the same for APC's bills for all other APC clinics.

76. Further, Defendant Naushad routinely directed office personnel to provide narcotics prescriptions to patients without conducting a medical examination. Plaintiff-Relators were instructed by Defendant Naushad and his wife Wajiha on several different occasions to print out the prescriptions and provide them to the patient without having been examined by a physician examination. The billing computer system would indicate the patient had a cancelled visit, *i.e.,* it would appear on the next printed missed visit report. Upon information and belief, Defendants UPS and Azeem Meo and his staff may have changed the cancelled visit to the same CPT code as the patient's previous visit. As a result, Defendants would have submitted false claims to Medicaid and/or Medicare for examinations that never occurred.

77. In or around October 2006, APC hired a new physician, Dr. Aiden Clark. Plaintiff-Relators frequently overheard Defendants Defendant Naushad and Azeem Meo complain about billing office visits below a level three. Dr. Clark was fired in February 2007. Plaintiff-Relators believe Dr. Clark was terminated, *inter alia*, because he actively and openly questioned Defendants Naushad's and Meo's billing practices.

22

78. Further, all of the Nurse Practitioners at APC were instructed to always bill office visits at a code of at least 99213 (15 minutes) regardless of the actual length of the patient visit. The Nurse Practitioners complicity in this fraudulent practice was compelled by the threat of termination by Defendant Azeem Meo that if they failed to prepare all bills with at least the 99213 code for each patient visit.

## C. False and Fraudulent Billing for Epidurogram Services Not Provided for 72275 (Epidurogram).

79. All APC patients that required an epidural injection were billed to Medicare and/or Medicaid for a 72275 Epidurogram. APC had the capacity to perform the Epidurogram test; however, it was never actually performed, yet billed to Medicare and/or Medicaid on numerous occasions.

80. To perform a valid Epidurogram, a patient must receive an injection of at least 20 cc's of Isovue, a dye. The appropriate dose of Isovue dye is critical to the clarity of the image produced by the Epidurogram. However, APC routinely injected patients with less than the required dose of Isovue dye. APC did so because the procedure being performed was not an Epidurogram, but instead a florisopical guidance – a procedure which is meant to confirm that a needle was placed properly.

81. From 2000 through 2006, florisopical guidance was described by CPT® code 76005, defined as follows:

Fluoroscopic guidance and localization of needle or catheter tip for spine or paraspinous diagnostic or therapeutic injection procedures (epidural, transforaminal epidural, subarachnoid, paravertebral facet joint, paravertebral facet joint nerve or sacroiliac joint), including neurolytic agent destruction.

23

82. In 2007, this procedure was renumbered to 77003. The service (and descriptor) is identical and the coding and payment considerations are not changed with the renumbering.

83. As confirmed by the dosage of Isovue dye routinely injected into patients (which was only sufficient to deficient to perform a florisopical guidance), Defendants routinely upcoded bills submitted to Medicaid and/or Medicare to reflect that Epidurograms had been performed. Specifically, these claims were billed to (and paid by) Medicare/Medicaid under *both* CPT code 72275 and 76005, rather than for the code for the procedure actually performed - a Fluoroscopy - CPT code 76005/77003.

84. Notably, the CPT code for an Epidurogram, 72275, is defined as a formal study that *includes* a fluoroscopy. A hard copy of the Epidurogram and a formal written report must be maintained by a beneficiary's provider to bill properly for CPT code 72275. If this documentation is not available, the provider is required by law to bill the procedure as 76005.

85. This false Medicare and Medicaid billing scheme is readily evident from APC patient charts. Specifically, the APC patient charts will specifically corroborate that Defendants not only failed to use the sufficient dosage of Isovue dye to perform an Epidurogram, but also APC patients' records will not contain the essential Medicare/Medicaid documentation - the hard copy of the Epidurogram or a formal written report.

**D.      False and Fraudulent Billings of Nurse Practitioner Services as "Incident to" a Physician When No Physician Was Present.**

86. APC operates 4 separate clinics each of which is assigned a unique tax identification number. Accordingly, proper claims for services rendered should reflect

24

the clinic where the services were provided and the unique tax identification number of the center.

87.     At all times relevant to the Complaint, to unlawfully maximize reimbursements, services performed by unsupervised APC Nurse Practitioners at all APC clinics were unlawfully billed to Medicare and other government payors under the unique provider number of Abdul Naushad, M.D. In addition, APC's false claims for such services also routinely misrepresented that they had been provided incident to Defendant Naushad at the Popular Bluff APC clinic and were prepared containing the Popular Bluff address and tax identification number. They were falsified in this manner by APC and its co-conspirator UPS knowing that the services being billed for were not incident to Defendant Naushad and were not performed at the Poplar Bluff clinic.

88.     Pursuant to Medicare and Medicaid regulations, a Nurse Practitioner can bill services as "incident to" a physician if the physician is present at the time of treatment, *i.e.*, the nurse practitioner is working under the "direct supervision" of the physician.

89.     "Direct supervision" in the office setting means the physician must be present in the office suite and immediately available and able to provide assistance and direction throughout the time the service is performed.

90.     Nurse Practitioner services provided without the supervision of a physician is reimbursed by the Program at 85% of the physician fee schedule rate, and must be billed under the Nurse Practitioner's provider number.

91.     Defendants made it their standard operating billing procedure to bill all services rendered by Nurse Practitioners as "incident to" services provided to Abdul

25

Naushad, M.D. Nurse Practitioner services were unlawfully billed this way even when it was known that at the time such services were rendered, Defendant Naushad was not present anywhere in APC's office, much less directly supervising the Nurse Practitioners.. Accordingly, because these services were not provided under the "direct supervision" of Defendant Naushad, the claims submissions to Medicare and Medicaid representing those services to have been "incident to" Defendant Naushad were false as that term is defined under the FCA.

92.    Moreover, during all times relevant to the Complaint, Defendants never even attempted to obtain unique provider identification numbers for their Nurse Practitioners, which was essential to proper billing to Medicare and Medicaid.

93.    The APC nurses whose unsupervised services were unlawfully billed to Medicare and Medicaid as incident to Defendant Naushad include Leigh Little, APN, MyLinda Hall, APN, Annetta Schwader, APN, and Donna Baudendistal, APN.

94.    The reverse side of every HCFA 1500 form sent by a provider via mail or electronically to a third party payor contains the following certification:

> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were *personally performed by me or were furnished incident to my professional service by my employee under my immediate personal supervision*, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

95.    Accordingly, Defendants engaged in this unlawful billing notice despite being notified in claims submissions of the "personal performance" certification on the reverse side of the HCFA 1500 form. An additional notice on the form certifies that the "foregoing information is true, accurate and complete."

26

96. Knowingly misidentifying the provider who actually rendered the services in Box 31 of the HCFA 1500 form is a violation of the False Claims Act.

97. The fact that physical therapy services were actually rendered does not negate APC's representation that Abdul Naushad, M.D. performed the services described on the claim forms or that those services were rendered incident to his supervision. It is the representation of Abdul Naushad, M.D.'s involvement that is "false," and that falsity is sufficient to satisfy the first element of an FCA claim.

98. Plaintiff-Relators also recall that almost all of the services performed by Defendant APC's physicians were unlawfully billed under Defendant Naushad's provider identification number. These physicians included, but are not limited to, Dr. Eaton (Poplar Bluff and Farmington Clinics), Dr. Milton Levin (Poplar Bluff Clinic), Dr. Chandresh Shah (Farmington Clinic) and Dr. Ehad Abdullah, Milton Levin, M.D., Gundalapali Sai, M.D. and Mazher Hussain, M.D.

99. This unlawful practice can be corroborated by the "Bill As" profiles of APC physicians in APC's billing software. The software had been programmed such that a procedure performed by one of the aforementioned physicians was "Billed As" Defendant Naushad, *i.e.*, billed as if the services had been performed by Defendant Naushad, instead of being billed under their own provider identification numbers.

## E. False and Fraudulent Upcoding of Isovue Prescription Drug Reimbursement Claims.

100. Isovue is a radiopaque agent used to diagnose certain medical conditions. It contains iodine, and when injected, the dye tints blood vessels and surrounding structures opaque or white so they are visible in x-rays or CT scans. During procedures

27

involving injections, Defendant APC routinely used Isovue for florisopical guidance – to confirm that the needle had been placed properly.

101.    The amount of Isovue used by APC, in particular Defendant Naushad, varied depending upon the procedure in amounts ranging from 3 cc's to 10 cc's; however, Defendant Naushad always used the same amount of Isovue for each specific procedure.

102.    Plaintiff-Relator Schwader had created billing templates for each procedure performed by Defendant Naushad.  Since Defendant Naushad performed each procedure the same way each time, with the same amount of supplies, he had Plaintiff-Relator Schwader create a billing template for each procedure he performed.  The billing templates contained the following information to facilitate the billing company's preparation of a claims submission: a description of the procedure performed, a list of supplies used during the procedure and how much of each supply had been used during the procedure.  The only thing a physician was required to add was the patient name, change the amount of medication used and prepare a commentary of complications that arose during a procedure, if any.

103.    These billing templates for procedures requiring the use of Isovue were accurate until January 2007.  Prior to January 2007, each procedure billing templates accurately reflected the amount of Isovue used by Defendant Naushad and therefore the Isovue reimbursement claims were accurate and appropriate.

104.    In January 2007, however, Defendant Naushad initiated an unlawful scheme to overbill Medicare and Medicaid for Isovue.  Specifically, in January 2007, Defendant Naushad instructed Plaintiff-Relator Schwader during telephone conversations

28

and *via* email to change the APC billing templates for procedures involving the use of Isovue by increasing the dosage of Isovue that would be billed for in the reimbursement claim submitted to Medicare/Medicaid. Defendant Naushad gave this instruction despite the fact he never did, nor intended to, increase the amount of Isovue used during any of his procedures. To the contrary, he instructed Plaintiff-Relator Schwader to revise the Isovue billing templates for the purpose of overstating the amount of Isovue used during each procedure he performed that required Isovue dye.

105. For example, when Defendant Naushad performed a Lumbar Epidural injection, he used 2 cc's Isovue *every time*. Plaintiff-Relator Schwader has personal knowledge of this because she had assisted Defendant Naushad in procedure room by handing Isovue vials to him for approximately 3 months. Nevertheless, *via* email and over the phone, Defendant Naushad asked Plaintiff-Relator Schwader to increase this amount to 10 ccs. Ron Chapman (an APC technician) also has personal knowledge from assisting Defendant Naushad during Isovue procedures that Defendant Naushad always used the same amount of Isovue and other medications for a given procedure and that this never changed, even after Defendant Naushad directed that the Isovue entries in the billing templates be increased.

106. The following is a chart identifying each procedure performed, the amount of Isovue dye used by Defendant Naushad and the amount of Isovue actually billed for at the direction of Defendant Naushad as detailed above:

| PROCEDURE | ISOVUE DOSAGE USED | ISOVUE DOSAGE UNLAWFULLY BILLED TO MEDICARE & MEDICAID |
|---|---|---|
| Si Joint injection | 2ccs | 10ccs |

| Transforaminal injection | 2 ccs per level (typically 1 or 2 levels) | 10 ml total, regardless of number of levels actually performed |
|---|---|---|
| Cervical epidural | 3 ccs | 10 ccs |
| Caudal injection | 3 ccs | 10 ccs |
| Lumbar epidural injection | 3 ccs | 10 ccs |
| Thoracic epidurals | 3 ccs | 10 ccs |
| Discogram (cervical and lumbar) | 5 ccs | 30 ccs |

107.    Defendants' scienter is directly corroborated by Defendant Naushad's instruction to tamper with APC's billing templates with no intent to deviate from his standard regimen of Isovue use. Accordingly, every one of the claims generated from these billing templates were knowingly false when submitted because they sought reimbursement from Medicare and Medicaid for medical supplies that had not been rendered to program beneficiaries. Indeed, each claim more than doubled the actual amount of Isovue dye used in the treatment of Medicare beneficiaries.

108.    Defendants knowingly submitted false Isovue claims to Medicare and Medicaid from January 2007 until July 2007.

**F.    False and Fraudulent Narcotic Prescription Drug Claims for Patients Excluded by Failed Drug Screens.**

109.    As stated *infra*, Defendant APC is in the business of providing pain management healthcare. As such, Defendant APC routinely prescribed FDA regulated narcotics to its patients to help reduce patients' pain.

110. As a prerequisite to prescribing narcotic drugs for pain, Medicare and Medicaid regulations require beneficiaries to undergo drug screenings. A positive result on these drug screenings prohibits healthcare providers from prescribing pain narcotics.

111. Defendant APC was forced to "fire" approximately 500 of his patients because of failed drug screens.

112. Accordingly, Defendant Naushad lost a great deal of business – and Program revenues – as a result of the failed drug screenings. To prevent failed drug screenings, Defendant Naushad directed the lab technicians to discontinue testing for marijuana.

113. Further, as recent as November 2007, Defendant Naushad began contacting previously "fired" patients who had failed their drug tests to invite them back to the Clinic for their narcotic drug needs. In fact, Defendant APC had already scheduled new appointments for at least seven (7) fired patients as of on Plaintiff-Relators' last day of their employment.

114. Upon information and belief, Defendants submitted fraudulent claims and received reimbursement for medical services provided to Medicaid and/or Medicare beneficiaries that were fired as patients due to failed drug screens.

## F. Defendants' Fraudulent Scheme of Billing for Medically Unnecessary Services.

### 1. Bilateral Medial Branch Blocks

115. Defendant APC routinely performs medial branch blocks to treat refractory back or neck pain. These blocks can be performed in the cervical, thoracic, or lumbar areas of the spine, depending upon the site of pain or pathology.

31

116. Defendant APC made it common practice to perform bilateral medial branch blocks on the Programs' beneficiaries regardless of whether the patient was experiencing pain on both sides of his/her body. Accordingly, APC physicians knew at the time of performing these services they were not medically justified and in fact were medically unnecessary.

117. On numerous occasions, Relator-Plaintiffs witnessed patients complaining to APC's treating physicians about having performed the more invasive and painful bilateral medial branch blocks when the patient was only experiencing unilateral pain.

118. APC performed the more invasive and painful bilateral medial branch blocks because that procedure is reimbursed at a higher rate than the unilateral branch blocks that should have been provided to such patients.

119. Defendants routinely billed Medicaid and/or Medicare for both nerves under the CPT codes of 64475 (first nerve) and 64476 (additional nerve) to obtain greater reimbursement for such medically unnecessary services.

120. Moreover, performing medial branch blocks on Medicare and Medicaid beneficiaries bestowed additional financial benefits upon APC. Defendants knew that once a patient received a diagnostic medial branch block, he or she must come in for additional diagnostic blocks two weeks later and ultimately must receive a radio frequency ablation to the nerves. Therefore, by performing bilateral medial branch blocks when only a unilateral medial branch block was medically necessary, Defendants were able to bill Medicare and Medicaid for three (3) additional, medically unnecessary and unjustified services under CPT 64476 – the initial diagnostic branch block, the follow-up diagnostic branch block and the ultimate radio frequency ablation of the nerve.

32

121.    Defendants routinely submitted false claims for all three medically unnecessary services to Medicaid and/or Medicare, knowing at the time such claims were submitted there were false and should not be paid or allowed by the Programs.

## 2.    Billing for Medically Unnecessary Nerve Conduction Studies

122.    A nerve conduction study is a test commonly used to evaluate the function of the motor and sensory nerves of the human body.

123.    Defendant Naushad made it common practice to administer nerve conduction studies regardless of whether it was a medically necessary service.  This unlawful business protocol was so extreme that Relator-Plaintiffs could identify which APC clinic Defendant Naushad had been working on any given day just by looking at the number of nerve conduction studies performed at a clinic for that day.

124.    Defendants routinely submitted claims to Medicaid and/or Medicare for medically unnecessary nerve conduction studies.    In total, Defendant APC has approximately 10,000 patients.

125.    Defendant Naushad systematically performed the nerve conduction study on practically every one of his patients (Plaintiff-Relators estimate he performed this medically unnecessary procedure on approximately 85% of his patients) with the knowledge and intent to generate additional revenue from Medicare and Medicaid.

126.    Defendants routinely submitted knowingly false claims for nerve convection studies from December 2005 through July 2007 (at which time UPS was terminated as APC's billing company).

## G.    False Prescription Drug Reimbursement Claims for Drugs Illegally Purchased from Foreign Countries.

127. Only drugs sold in the United States are eligible for Medicare Part D/Medicaid prescription drug coverage.

128. Defendant APC, under the stewardship and control of Defendant Naushad, purchased FDA-regulated drugs Synvisc and Botox from foreign countries, including Canada and Europe. APC's purchased Synvisc and Botox from foreign countries because the drugs cost considerably less than they would have cost had they been purchased within the United States.

129. The cost to providers to purchase Synvisc in the United States is approximately $150.00 per injection. The reimbursement rate is approximately $180.00 per injection which gives providers only a $30.00 profit per injection. However, by surreptitiously purchasing and importing Synvisc from Canada, the cost per injection for APC was only approximately $60.00 per injection, thereby increasing APC's pure profit 4 fold - or $120 of profit for *each* injection. Defendant APC engaged in this unlawful practice for the purpose of increasing the profit margins by unlawfully seeking reimbursements for these unregulated foreign drugs from Medicaid and/or Medicare.

130. Because the FDA does not regulate the safety and efficacy of drugs produced in foreign countries, this practice seriously jeopardized the health and welfare of the ultimate consumer of the drug - Defendant Naushad's patients. For example, in July 2004, the FDA announced that its investigators bought three commonly prescribed drugs -Viagra, Lipitor, and Ambien - from a Web site advertising "Canadian generics," and found that the drugs were fake and potentially dangerous. It was also medically unethical for Defendants to provide imported drugs to Medicare and Medicaid beneficiaries without disclosing this material fact.

131. In addition, drugs are required by Medicare and Medicaid regulation to have been purchased within the United States to properly seek reimbursement from those Programs for prescription drugs administered to Program beneficiaries. These regulations are material to the Program's allowance and reimbursement of prescription drug claims. In knowing violation of these seminal eligibility requirements, Defendants submitted reimbursement claims to Medicaid and/or Medicare for Synvisc and Botox purchased in foreign countries at the Program's fee schedule set rate.

132. Alternatively, these prescription drug reimbursement claims were false because they represented that the drugs purchases for which reimbursement were sought was made within the United States

133. Defendants continue to benefit from the higher profit margin as a result of the illegal foreign purchases at the expense of the safety of APC's patients and to the financial detriment of the Medicaid and/or Medicare programs.

## H. Fraudulent Scheme of Billing Fluoroscopies at Each Level.

134. Upon information and belief, Defendants routinely took a fluoroscopy of multiple levels of a single anatomical region. Defendants would then submit codes with a quantity modifier that represented to Medicare and/or Medicaid that the fluoroscopies were taken on additional anatomical regions. For example, Defendant APC would perform a lumbar medial branch block on L2-3, L3-4, and L4-5 (all of which are within the lumbar region) and bill for 3 units of the same codes signifying that the fluoroscopes were also performed on two separate anatomical regions other than the lumbar region.

135. Defendants knew, or recklessly disregarded, that they could not submit separate claims for reimbursement unless the fluoroscopes were performed on separate

anatomical regions. Notwithstanding this fact, Defendants made it their common practice to submit false claims for reimbursement for multiple fluoroscopes performed within a single anatomical region in direct violation of the rules and regulations of Medicaid and Medicare.

## I.    False and Fraudulent Billings of OIG-Excluded Physicians as *Locum Tenens* to Defendant Naushad.

136.    From July 2007 to September 2007, APC hired Dr. Gary Eaton to provide pain management services.

137.    For the duration of Dr. Eaton's employment, APC failed to obtain a unique provider identification number for Dr. Eaton. Instead, APC billed Dr. Eaton as a *locum tenen* to Defendant Naushad to the Medicare and Medicaid Programs. Dr. Ehab Abdullah, Dr. Chandresh Shah (Farmington Clinic) and Dr. Mutha Ramasamy (Poplar Bluff and Farmington Clinics) were also improperly billed as *locum tenen* under Defendant Naushad to Medicare and Medicaid.

138.    With regard to locum tenens status, Medicare recognizes that physicians often retain a substitute physician to take over their professional practices while they are absent for reasons such as illness, vacation, continuing medical education and pregnancy. Medicare further recognizes locum tenens arrangements and pays the regular physician for services provided by the substitute physician, if:

- The regular physician is unavailable to provide the services;
- The beneficiary has arranged or seeks to receive the services from the regular physician;
- The regular physician pays the locum tenens physician on a per diem or a fee-for-service basis;
- The locum tenens physician does not provide services to beneficiaries over a continuous period of longer than 60 days; and

36

- The regular physician identifies the locum tenens physician on claims submitted for the services provided by the locum tenens physician.

139. Medicare pays theses claims as if they were provided by the regular physician. However, to properly bill services provided by a locum tenses, the provider is required to enter the substituting physician's unique physician identification number (UPIN) on the HCFA 1500 form. The billing physician must also list his or her UPIN on the HCFA claims form. Accordingly, for each in *locum tenens* claim, the physician was billed under Defendant Naushad's provider number with the physicians' names and UPIN numbers on the claim and containing a Q6 modifier to alert that the claim being submitted was a *locum tenen* claim.

140. Even worse, APC knew that while it was billing Dr. Eaton's services as in *locum tenens*, Dr. Eatan was on the Office of the Inspector General's Exclusion List. The OIG exclusions list is a powerful tool established by Congress to "prevent certain individuals and businesses from participating in Federally-funded health care programs." OIG September 1999 Special Advisory Bulletin. Specifically, the Federal government will not pay for any items furnished, ordered, or prescribed by an excluded person or business. *Id.* Violations of this policy cost providers at $10,000 per incident, and up to three times the cost of the service. *Id.*

141. "Providers and contracting entities have an affirmative duty to check the program exclusion status of individuals and entities prior to entering into employment or contractual relationships, or run the risk of CMP [civil money penalty] liability if they fail to do so." *Id.*

142. In addition, "[a] provider or entity that receives Federal health care funding may only employ an excluded individual in limited situations. Those situations

37

would include instances where the provider is both able to pay the individual exclusively with private funds or from other non-federal funding sources, and where the services furnished by the excluded individual relate solely to non-federal program patients…In many instances, the practical effect of an OIG exclusion is to preclude employment of an excluded individual in any capacity by a health care provider that receives reimbursement, indirectly or directly, from any Federal health care program." *Id.*

143.     Accordingly, Dr. Eaton's services were not eligible for reimbursement by the Medicare and Medicaid programs, in the capacity as an in locum tenens or otherwise.

144.     Their knowledge of the violations of Medicare regulations governing billings for in locum tenens and Dr. Eaton's OIG exclusion notwithstanding, Defendants knowingly submitted claims to the Medicaid and Medicare Programs seeking reimbursement for services rendered to APC patients by Dr. Eaton. These claims were further falsified because the claims misrepresented that the services had been provided by Defendant Naushad because his provider identification number was the sole unique provider identification number recorded in APC's claims submissions.

## K.     Defendants APC and UPS's Conspiracy to Defraud the Government by Getting False and Fraudulent Claims Paid.

145.     As set forth supra, the relationship between APC and Naushad and its billing company UPS was highly incestuous. UPS owner Defendant Meo is the former CEO of APC and the father-in-law of Defendant Naushad.

146.     By virtue of the unlawful acts detailed in this Complaint, Defendants APC and Naushad conspired with Defendants UPS and Meo to get false claims paid in violation of FCA §3729(a)(3). This conduct included Defendant Meo's falsification of APC claims prior to submitting them, falsification of APC patient records to substantiate

38

false APC billings, and the processing and submitting of APC reimbursement claims known by Defendants UPS and Meo to be false, among other things.

147. Defendants APC, Naushad, UPS and Meo all possessed the requisite intent in carrying out their unlawful conspiracy.

148. As a result of the conduct in furtherance of the conspiracy among Defendants APC, Naushad, UPS and Meo all acted with the requisite intent, the Government was harmed.

149. Further, upon information and belief, the relationship between Defendants involved multiple referrals in violation of the Anti-Kickback Statute. In turn, violations of the Anti-Kickback Statute are predicate acts for liability under the False Claims Act.

## VII.  THE FEDERAL FALSE CLAIMS ACT

150. Section 3729 of the Federal False Claims Act provides in pertinent part:

(a) Liability for certain acts. Any person who--

(1) *knowingly presents, or causes to be presented*, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) *knowingly makes, uses, or causes to be made or used*, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

*        *        *

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $11,000, plus 3 times the amount of damages which the Government sustains because of the act of that person,
…

39

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

151.    While the False Claims Act imposes liability only when the claimant acts "knowingly," it does not require that the person submitting the claim have actual knowledge that the claim is false. A person or entity who acts in reckless disregard or in deliberate ignorance of the truth or falsity of the information, also can be found liable under the Act. 31 U.S.C. §3729(b)

152.    In sum, the False Claims Act imposes liability on any person or entity that who submits a claim to the federal government that he or she knows (or should know) is false. An example may be a physician who submits a bill to Medicare for medical services she knows she has not provided. The False Claims Act also imposes liability on any person or entity who may knowingly submit a false record in order to obtain payment from the government. An example of this may include a physician who submits records or claims that he or she knows (or should know) is false and that indicate compliance with regulatory requirements that are a condition of Medicare or Medicaid reimbursement, such as the Anti-Kickback Statute.

153.    The FCA reaches all fraudulent attempts to cause the Government to pay out sums of money; liability is not limited to statements or claims made directly by a defendant to the Government. The unlawful and abusive Medicare and Medicaid billing practices of Defendants alleged with particularity in this Complaint are exactly that which is proscribed by FCA §§3729(a)(1) and (2).

154.    Further, Defendants APC and UPS's liability under FCA §3729(a)(3)

40

arises from their submission of false claims by colluding and agreeing to engage in conduct resulting in the submission of claims that were false because they were known not to be eligible for reimbursement. As described with particularity herein Defendants engaged in overt acts in furtherance of their conspiracy.

155. At all times relevant to the complaint, Defendants acted with the requisite intent, *i.e.*, knowledge as that term is defined by FCA §3729(b).

## COUNT I

### Submitting or Causing to Be Submitted False Claims
### 31 U.S.C. §3729(a)(1)

156. All of the foregoing paragraphs are incorporated by reference as though fully set forth herein.

157. This is a claim under the False Claims Act, 31 U.S.C. §§3729-33, as amended.

158. By means of the unlawful acts described above, defendants knowingly presented or caused to be presented false or fraudulent claims for payment of medical services to the United States' government. The United States, unaware of the falsity of the claims made by defendants, and in reliance on the accuracy thereof, paid defendants for claims that would otherwise not have been allowed.

159. Defendants each knowingly presented or caused to be presented false or fraudulent claims to federal healthcare programs, including the Medicare and Medicaid Programs.

160. The government of the United States has made and will make payment upon false and fraudulent claims and thereby suffer damages. The United States is

41

entitled to full recovery of the amounts paid to defendants by the Medicare/Medicaid programs pursuant to the submission of false claims, which defendants presented or caused to be submitted.

161. The Plaintiff-Relators believe and aver that they are original sources of the facts and information upon which this action is based.

162. WHEREFORE, Plaintiff-Relators, on behalf of themselves and the United States Government, request the following relief:

163. Judgment against each defendant in the amount of three (3) times the amount of damages the United States of America has sustained, plus a civil penalty of $11,000 for each violation of 31 U.S.C. § 3729 and the appropriate fines and penalties for violating the protective federal laws applicable to the fraudulent and false conduct and the costs of this action with interest;

164. That the Plaintiff-Relators be awarded all costs incurred, including reasonable attorneys' fees;

165. In the event the United States proceeds with this action, Plaintiff-Relators be awarded any appropriate amount for disclosing evidence or information that the United States did not possess when this action was disclosed to the government. The amount awarded to the Plaintiff-Relators should include the results of Government actions or settlement of claims resulting from the expansion of claims through the Government's further investigation directly generated from or attributable to Plaintiff-Relators' information; and

166. Such other relief as this Court deems just and appropriate.

## COUNT II

42

## Use of False Statements to Get False or Fraudulent Claims Paid or Allowed
## 31 U.S.C. §3729(a)(2)

167.   All of the foregoing paragraphs are incorporated by reference as though fully set forth herein.

168.   This is a claim for treble damages, civil penalties and attorney's fees, under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* as amended.

169.   By creating knowingly false documents, claims and records as described above, defendants knowingly made or used false records or statements to get false claims paid by the United States, in violation of 31 U.S.C. §3729(a)(2).

170.   The United States, unaware of the falsity of the records or statements made by defendants, and in reliance on the accuracy thereof, paid defendants for claims that would otherwise not have been allowed.

171.   By virtue of the false or fraudulent records made or used, or caused to be made or used, by defendants, to get false or fraudulent claims paid or approved by the United States, the United States has suffered damages un an amount to be proven at trial.

172.   WHEREFORE, Plaintiff-Relators, on behalf of themselves and the United States government, request the following relief:

173.   Judgment against each defendant in the amount of three (3) times the amount of damages the United States of America has sustained, plus a civil penalty of $11,000 for each violation of 31 U.S.C. § 3729 and the appropriate fines and penalties for violating the protective federal laws applicable to the fraudulent and false conduct and the costs of this action with interest;

174.   That the Plaintiff-Relators be awarded all costs incurred, including

43

reasonable attorneys' fees;

175. In the event the United States proceeds with this action, Plaintiff-Relators be awarded any appropriate amount for disclosing evidence or information that the United States did not possess when this action was disclosed to the government. The amount awarded to the Plaintiff-Relators should include the results of Government actions or settlement of claims resulting from the expansion of claims through the Government's further investigation directly generated from or attributable to Plaintiff-Relators' information; and

176. Such other relief as this Court deems just and appropriate.

## COUNT III

### Conspiracy to Violate the False Claims Act
### 31 U.S.C. §3729(a)(3)

177. All of the foregoing paragraphs are incorporated by reference as though fully set forth herein.

178. This is a claim for treble damages, civil penalties and attorney's fees, under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* as amended.

179. As set forth above, defendants and their co-conspirators conspired with one another to defraud the United States government by submitting or causing the submission of false and fraudulent claims to the federal Medicare/Medicaid Programs as is more fully set forth above.

180. In furtherance of the conspiracy, defendants made and used false and fraudulent statements or caused false and fraudulent statements to be made or used for the purpose of getting their false claims paid or allowed by federal healthcare programs,

44

including Medicare and Medicaid. These claims and records were fraudulent for the various reasons set forth in the Complaint.

181. The government of the United States has made and will make payment upon false and fraudulent claims and thereby suffer damages. The United States is entitled to full recovery of the amounts paid to defendants by the Medicare/Medicaid programs pursuant to the submission of false claims, which defendants caused to be submitted.

182. The Plaintiff-Relators believe and aver that they are original sources of the facts and information upon which this action is based.

183. WHEREFORE, Plaintiff-Relators, on behalf of themselves and the United States government, request the following relief:

184. Judgment against each defendant in the amount of three (3) times the amount of damages the United States of America has sustained, plus a civil penalty of $11,000 for each violation of 31 U.S.C. § 3729 and the appropriate fines and penalties for violating the protective federal laws applicable to the fraudulent and false conduct and the costs of this action with interest;

185. That the Plaintiff-Relators be awarded all costs incurred, including reasonable attorneys' fees;

186. In the event the United States proceeds with this action, Plaintiff-Relators be awarded any appropriate amount for disclosing evidence or information that the United States did not possess when this action was disclosed to the government. The amount awarded to the Plaintiff-Relators should include the results of Government actions or settlement of claims resulting from the expansion of claims through the

Government's further investigation directly generated from or attributable to Plaintiff-

Relators' information; and

187.    Such other relief as this Court deems just and appropriate.

## JURY DEMAND

188.    Plaintiffs demand a trial by jury on all claims

Respectfully Submitted,

PLACZEK & FRANCIS
JENIFER M. PLACZEK, ESQUIRE
E.D. Mo. Bar No. 1693190
MATHEW W. PLACZEK, ESQUIRE
E.D. Mo. Bar No. 1693191
1722 South Glenstone, Suite J
Springfield, Missouri 65804
Phone (417) 883-4000
Fax (417) 887-1603

**KENNEY EGAN McCAFFERTY
& YOUNG, P.C.**
BRIAN P. KENNEY, ESQUIRE
MEREDITH T. SHEPHERD, ESQUIRE
BRANDON J. LAURIA, ESQUIRE
3031C Walton Road, Suite 202
Plymouth Meeting, PA 19462
Phone (610) 940-9099
Fax (610) 940-0284

Counsel for Relators

DATED: January 14, 2008